**GO MEDICAL INDUSTRIES PTY,
LTD. and Alexander G.B.
O'Neil, Plaintiffs,**

v.

**INMED CORPORATION d/b/a Rusch,
International, a wholly owned subsidiary of Teleflex, Inc., and Alpine Medical, Inc. (formerly known as Medical
Marketing Group, Inc.), Defendants.**

No. 1:01–CV–313–TWT.

United States District Court,
N.D. Georgia,
Atlanta Division.

July 9, 2003.

Patrick J. Flinn, Robin Lynn McGrath, Angela Payne James, Alston & Bird, Atlanta, GA, for plaintiffs.

William H. Needle, Bernard Luke Zidar, Needle & Rosenberg, Robert Benjamin Hill, William Stroud Sutton, McLain & Merritt, Ronnie L. Quigley, John Michael Harrison, Davis, Matthews & Quigley, Atlanta, GA, for defendants.

*ORDER*

THRASH, District Judge.

This is an action for patent and trademark infringement. It is before the Court on motions for summary judgment filed by all parties. In summary, the Court holds that the Defendants have infringed the Plaintiffs' patent, but the patent is invalid due to prior art because it is not entitled to a priority date of 1979. *The conflicting* claims to ownership of the O'Neil trademark for urinary catheters present questions of fact to be decided at trial. The Plaintiffs are entitled to summary judg-

ment as to Defendants' non-trademark state law counterclaims.

## I. BACKGROUND

Plaintiff Dr. Alexander G.B. O'Neil is a resident of Subiaco, Australia. Dr. O'Neil is the inventor of the introducer tipped catheter described in U.S. Patent No. 4,652,259 ("the '259 patent") which he owns. Plaintiff Go Medical Industries, Pty, Ltd. ("Go Medical") is an Australian limited liability company with an office and place of business in Subiaco, Australia. It was founded by Dr. O'Neil. Defendant Alpine Medical is a Georgia Corporation with its principal place of business in Decatur, Georgia. Alpine Medical was formerly known as Medical Marketing Group, Inc. ("Medical Marketing"). For this Order, the name change can be ignored.

Plaintiffs obtained the United States patent on their introducer tipped catheter in 1987, with a priority filing date of 1979. Plaintiffs initially sold their product in the United States through their United Kingdom distributor. Medical Marketing learned of Plaintiffs' catheter in 1987, and inquired about becoming a distributor for Plaintiffs' product. They reached an agreement which gave Medical Marketing the right to manufacture and market Plaintiffs' introducer tipped catheter in the United States. Initially, Medical Marketing purchased the catheters it distributed from Plaintiffs. However, it soon started manufacturing the catheters itself, and the resulting sales began to dominate Medical Marketing's business.

In 1992, C.R. Bard, Inc. ("Bard"), another medical device manufacturer, began marketing an introducer tipped catheter. Plaintiffs filed suit in this district against Bard for patent infringement. In that case, Bard filed several motions for summary judgment. The district court granted Bard's motion for summary judgment on unenforceability for inequitable conduct. After that ruling at the trial court level, Medical Marketing stopped paying royalties under its patent license from Plaintiffs. On appeal, the Federal Circuit disagreed with the district court, and reversed and remanded the case with instructions. The case then settled and never went to trial. After the settlement, Medical Marketing continued to withhold royalty payments. Plaintiffs eventually sent a notice of termination of the patent license to Medical Marketing, and thereafter filed this suit. Facts relevant to the individual motions are discussed in more detail below.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is material if it "might affect the outcome of the suit under the governing law." *Id.* The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. *DISCUSSION*

In this case, motions for summary judgment have been filed on multiple issues, including patent invalidity based on priority date, patent invalidity based on pre–1979 prior art, unenforceability for inequitable conduct, patent infringement, trademark infringement, lost profits and various state law claims. For the purpose of this Order, the motions are discussed separately below.

### A. *Invalidity Based on Priority Date*

The Plaintiffs' original United States patent application was filed in 1979. The '259 patent was issued based upon a 1985 continuation-in-part application. Defendants contend that the '259 patent is invalid because it was anticipated by an article written by Dr. O'Neil in 1982. There is no dispute that the article fully anticipates the '259 patent. (Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts, ¶ 52.) The only issue is whether the patent is entitled to a 1979 priority filing date, which would place Dr. O'Neil's 1982 article outside the scope of the prior art. The Defendants contend that the 1979 application does not meet the written description, enablement and best mode requirements of 35 U.S.C. § 112 for the device subject to the '259 patent. If it does not, the Plaintiffs are not entitled to the 1979 priority date and the '259 patent is invalid under 35 U.S.C. § 102(b).

■ The 1979 application was directed to a "medical instrument" intended for insertion into a variety of body passages including the urinary tract and trachea. The penetration of the outer sheath into the passage was to go no further than the extent of the bacterial contamination in the passage. This distance was not specified in the application. The application was rejected by the examiner as anticipated or obvious over the prior art. After a series of continuation applications were rejected, Dr. O'Neil filed a continuation-in-part application in 1985, and the '259 patent issued in 1987. The continuation-in-part application of 1985 claimed priority to the 1979 parent application, and the patent examiner granted that priority date when the patent issued. This decision is presumed to be correct. *Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc.*, 98 F.3d 1563, 1569 (Fed. Cir.1996). A continuation-in-part application contains subject matter from a prior application and may also contain additional matter not disclosed in the prior application. *Augustine Medical, Inc. v. Gaymar Industries, Inc.*, 181 F.3d 1291, 1302 (Fed. Cir.1999). Subject matter that arises for the first time in the continuation-in-part application does not receive the benefit of the filing date of the parent application. *Id.* In this case, to be entitled to the 1979 priority date, the parent application's disclosure must satisfy the requirements of 35 U.S.C. § 112 with respect to the claims in the 1985 continuation-in-part application. 35 U.S.C. § 120. Put in the context of this case, the disclosure in the 1979 parent application must satisfy the written description, enablement and best mode requirements of section 112 for the introducer tipped urinary catheter claimed in the 1985 application.

### 1. *Written Description Requirement*

■ The first requirement of section 112 is that the written description in the 1979 application reasonably convey to one with ordinary skill in the art that Dr. O'Neil possessed the claimed device in 1979. 35 U.S.C. § 112. Whether Dr. O'Neil actually had the device is not material; rather, the issue is whether the written description indicates that he had the device when he filed the parent application. *New Railhead Mfg., L.L.C. v. Ver-*

*meer Mfg. Co.,* 298 F.3d 1290, 1295–96 (Fed.Cir.2002). Moreover, it is not enough that the claimed device is made obvious by the parent application's declaration. The Defendants contend that the 1979 application does not describe a catheter with an insertion tip of "about 1.5 cm." It is undisputed that "about 1.5 cm" and "position of maximum pressure" do not appear in the 1979 parent application. The question then is whether the language of the parent application is the legal equivalent of the 1985 claim language, such that the necessary and only reasonable construction to be given the disclosure in the parent application by one skilled in the art, is the same as the construction such a person would give the claim language of the later application. *Id.* at 1295; *Lockwood v. American Airlines, Inc.,* 107 F.3d 1565, 1567–72 (Fed.Cir.1997); *Wagoner v. Barger,* 59 C.C.P.A. 1213, 463 F.2d 1377, 1380 (Cust. & Pat.App., 1972), *superceded on other grounds, Kubota v. Shibuya,* 999 F.2d 517 (Fed.Cir.1993); *Behr v. Talbott,* 27 U.S.P.Q.2d 1401, 1992 WL 512237 (Bd.Pat. App & Interf., 1992); *see also Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc.,* 98 F.3d 1563, 1583 (Fed.Cir.1996) (Newman, J., dissenting) (citing *Wagoner v. Barger*). "The adequacy of the written description (*i.e.,* the disclosure) is measured from the face of the application; the requirement is not satisfied if one of ordinary skill in the art must first make the patented invention before he can ascertain the claimed features of that invention." *New Railhead,* 298 F.3d at 1295.

■ Defendants must show that what Dr. O'Neil claimed in 1985 is not the "necessary" and "only reasonable construction" of the language in the 1979 parent application. Claims 1 through 4 of the '259 patent recite that the stop member is to be spaced from the distal end of the sheath "about 1.5 cm." The method claims require that the distal end of the sheath be placed "equal to the distance between the position of maximum pressure and the lower end of the urethra." Neither the disclosure nor the claims of the 1979 application contain the terms "about 1.5 cm" or "position of maximum pressure." The prior art in 1979 does not necessarily import these terms into the 1979 application. In 1979, there was considerable disagreement as to the extent of bacteria contamination in the urethra. (*See* Def.'s Ex. 8, Clair E. Cox, *The Urethra and its Relationship to Urinary Tract Infection,* 59 S. Med. J., 621 (1966) (finding bacteria in the third and fourth centimeters of the urethra in 80% and 54% of the study participants); Def.'s Ex. 9, Clair E. Cox, Sushil S. Lacy, Frank Hinman, Jr., *The Urethra and its Relationship to Urinary Tract Infection II,* 99 J. Urol., 632 (1968) (finding bacteria present in the fourth centimeter in 77.2% of study participants); Def.'s Ex. 11, W.C. Mortimer, G.A. Mobbs, Janet Boulton, *The Bacterial Content of the Female Urethra in Pregnancy,* 74 J. Obstet. Gynec. Brit. Cwlth., 579 (1967) (finding 49% of study participants had bacteria present at 2.54 centimeters into the urethra); Def.'s Ex. 12, Michael E. Mayo, Frank Hinman, *Role of Mid–Urethral High Pressure Zone in Spontaneous Bacterial Ascent,* 109 J. Urol., 268 (1973) (hypothesizing that a mid-urethral high pressure zone functions as a natural barrier to bacterial ascent)). While it is true that Mayo and Hinman believed that bacteria contamination extended to a position of maximum pressure about 1.5 centimeters into the urethra, it is also true that other researchers believed bacterial contamination extended much farther. In fact, Dr. O'Neil himself indicated that given a choice, the majority of those with knowledge in the art of the invention would have accepted Dr. Clair Cox as the authority in the field. Dr. Cox reported bacterial contamination into the third and fourth centimeters of the ureth-

ra. (Dep. Alexander G.B. O'Neil (9/21/94) at 153–154.) Thus, the prior art demonstrates that one skilled in the art of the invention would have been more likely than not to reject the 1.5 centimeter limitation as the ideal point of penetration for the tip of the sheath.

■ The evidence presented by Plaintiffs does not create a genuine issue of material fact. Initially, Plaintiffs rely on the drawings in the 1979 parent application to satisfy the written disclosure requirement. *See Vas–Cath Inc. v. Mahurkar,* 935 F.2d 1555, 1564 (Fed.Cir.1991) (drawings can satisfy the written description requirement of section 112). However, the drawings do not supply a written description of the 1985 claims. First, none of the drawings from the 1979 parent application offer any support for the "known position of maximum pressure" language first used in 1985. (*See* Pl.'s Ex. 6 at GML 03443—03444). Thus, the idea of extending the protective sheath to a "known position of maximum pressure" is not supported by the 1979 parent application drawings. Additionally, the 1979 drawings fail to support the 1.5 centimeter limitation disclosed for the first time in 1985. The drawings depict a cross-section of the urethra and bladder, and examples of Plaintiffs' catheter insertion device. However, none of those drawings contain measurements or scales from which one skilled in the art of the invention would necessarily conclude that O'Neil possessed the invention claimed in 1985. (*See* Pl.'s Ex. 6 at GML 03443—03444.)

■ The Plaintiffs rely on Figure 1 of the 1979 application to show the 1.5 centimeter limitation by means of a 1 to 1 ratio. However, the Federal Circuit has repeatedly held that drawings without references to quantitative values cannot be relied upon to provide precise measurements. *Hockerson–Halberstadt, Inc. v. Avia Group Intern., Inc.,* 222 F.3d 951, 956 (Fed.Cir.2000) ("patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue"); *Application of Wright,* 569 F.2d 1124, 1127 (Cust. & Pat.App., 1977) ("absent any written description in the specification of quantitative values, arguments based on measurement of a drawing are of little value"). Thus, Figure 1 in the parent application does not necessarily disclose to one skilled in the art that Dr. O'Neil possessed in 1979 a catheter insertion device with a 1.5 centimeter introducer tip. Like all of the figures in that application, Figure 1 contains no quantitative figures or scales upon which to base a measurement. The Federal Circuit prohibits reliance upon such unspecific drawings to support claim limitations.

Even in the absence of adverse Federal Circuit precedent, this Court would not rely upon any of the drawings in Plaintiffs' 1979 application to support the 1.5 centimeter limitation. Plaintiffs ask this Court to construe one drawing to have a 1 to 1 ratio, a second drawing to have a 4.5 to 1 ratio, and still a third to have a ratio of 3.14 to 1. These varying ratios, concocted simply to generate measurements within this Court's claim construction order, belie Plaintiffs' claims that Dr. O'Neil's diagrams were drawn to any scale whatsoever. It is especially telling that Plaintiffs' expert interpreted the drawings differently before and after the claims construction order. (*Compare* Def.'s Ex. 8 at 4 *with* Def.'s Ex. 9, Affidavit of Sam D. Graham, ¶ 6–7.) The drawings of the parent application do not support the 1.5 centimeter limitation first claimed in 1985.

Plaintiffs also assert that the prior art supports the 1979 priority date. Plaintiffs argue that one skilled in the art would follow the teachings of the 1972 article by Mayo and Hinman, rejecting the entire

body of scholarship suggesting that bacteria contamination extends beyond 1.5 centimeters. Thus, Plaintiffs conclude, there is support for the 1.5 centimeter limitation. As noted above, there was a wide divergence of opinion in the medical literature as to the extent of bacterial contamination in the urethra. There is simply nothing in the written description of the parent application from which one could conclude that the "necessary" and "only reasonable" construction to be given the parent application is that Dr. O'Neil possessed an invention corresponding to his 1985 claims.

The Defendants have met their burden of showing by clear and convincing evidence that the 1985 continuation-in-part application is not entitled to the 1979 priority date for the non-obvious features of the O'Neil urinary catheter. From the above discussion, at a minimum, the construction required by the 1.5 centimeter and known position of maximum pressure limitations of the 1985 continuing in part application is not the "necessary" and "only reasonable" construction of the 1979 claim language. This was new matter. It would have been possible, reasonable, and even probable for one of skill in the art in 1979 to construe Plaintiffs' parent application as describing a sheath longer than 1.5 centimeters, without regard to any position of maximum pressure. This is not a close case. The examiner was simply wrong to give the 1985 continuation-in-part application priority to 1979 in its entirety, just as he was wrong to miss the two gaps in copendency at issue in the Bard litigation. Accordingly, because it fails to meet the section 112 written description requirement, the 1985 continuing in part application is not entitled to the 1979 priority date. The '259 patent is invalid due to the anticipatory 1982 article.

### 2. Best Mode Requirement

■ For the sake of completeness, this Court will analyze the best mode and enablement requirements of 35 U.S.C. § 112 as well. Viewing the evidence in the light most favorable to Plaintiffs, Dr. O'Neil's 1979 application does not satisfy the best mode inquiry of 35 U.S.C. § 112 with respect to the invention claimed in 1985. The best mode inquiry is straightforward. First, the Court must determine whether, at the time he filed the parent application, Dr. O'Neil possessed a best mode for practicing his urinary catheter invention. *Bayer AG v. Schein Pharmaceuticals, Inc.*, 301 F.3d 1306, 1320 (Fed.Cir.2002). Second, the Court must determine whether, if Dr. O'Neil did have a best mode, his disclosure was sufficient to allow others to practice that best mode. *Id.*

■ The evidence shows that in 1979, Dr. O'Neil did possess a best mode for practicing his urinary catheter invention. In a deposition taken on September 21, 1994, Dr. O'Neil confirmed that in 1979 he was making a catheter which had a length of 1.5 centimeters from the stop member to the distal end of the protective sheath. He went on to call that particular design the "preferred embodiment" of his invention. (Dep. O'Neil (9/21/94) at 228.) Thus, the first prong of the best mode inquiry is satisfied, as Dr. O'Neil had a best mode for his urinary catheter invention when he filed the parent application in 1979. *See Bayer AG*, 301 F.3d at 1319 (finding failure to disclose preferred embodiment violated best mode requirement).

The evidence also shows that Dr. O'Neil's disclosures in the 1979 application were not sufficient to allow others to practice that best mode. First, there was no express disclosure of the 1.5 centimeter limitation in the parent application. Instead, Dr. O'Neil's 1979 disclosure simply teaches the creation of a catheter insertion device extending to just beyond the area of bacterial contamination in a given body opening. The application claimed a much

broader invention than the urinary catheter that was Dr. O'Neil's preferred embodiment. Dr. O'Neil, however, had additional information about the way to make a urinary catheter to accomplish that goal, but did not disclose it. He kept that information for himself, leaving others to do their own experiments on the usual extent of bacterial contamination in the urethra. While it might have been possible to create a urinary catheter from the 1979 disclosure, possibility is an enablement question; the issue under this prong of the section 112 analysis is whether Dr. O'Neil disclosed a known best mode for the device he sought to patent. He did not, and thus the parent application fails the best mode inquiry of 35 U.S.C. § 112 with respect to the invention claimed in 1985.

Dr. O'Neil's failure to disclose his 1.5 centimeter preferred embodiment is analogous to those cases where the Federal Circuit has confirmed a violation of the best mode requirement when the preferences of the preferred embodiment materially affect the properties of the claimed invention. *See Bayer AG*, 301 F.3d at 1319–20; *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 940 (Fed.Cir. 1990) (failure to disclose use of a superior audiotape which met inventor's specifications); *Spectra–Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1537 (Fed.Cir.1987) (failure to disclose six step brazing process used where patent stressed importance of brazing process in attaching cup to tube); *Dana Corp. v. IPC Ltd. Partnership*, 860 F.2d 415, 420 (Fed.Cir.1988) (failure to disclose necessity of flouride treatment to prevent leakage); *Chemcast Corp. v. Arco Indus. Corp.*, 913 F.2d 923, 929–30 (Fed. Cir.1990) (failure to disclose particularly hard material for locking portion of grommet); *U.S. Gypsum Co. v. National Gypsum Co.*, 74 F.3d 1209, 1213 (Fed.Cir.1996) (failure to disclose a particular perlite for joint compound which inventor believed improved the invention overall); *Great*

*Northern Corp. v. Henry Molded Products, Inc.*, 94 F.3d 1569, 1571 (Fed.Cir. 1996) (failure to disclose diamond indentations necessary for a usable product); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1065 (Fed.Cir.1998) (failure to disclose machining parameters required to get proper micro pitting for implant element).

The purpose of Dr. O'Neil's catheter insertion device is to prevent bacteria from migrating up the urethra to the bladder during catherization. To accomplish this, he used an introducer tip which functions as a protective sheath to shield the catheter from the bacteria contaminated portion of the urethra. In 1979, Dr. O'Neil knew the precise length which the protective sheath should be to accomplish his goal of preventing urethral bacteria migration, but he failed to disclose that length in his patent application. Dr. O'Neil himself has called this distance "crucial" to the success of his invention, for if the sheath is not the correct distance from the stop member, the catheter will carry bacteria into the bladder and cause an infection. (U.S. Patent # 4,652,259 at Col. 2 ln. 65 to Col. 3 ln. 11.) Dr. O'Neil believes the 1.5 centimeter introducer tip minimizes the chance of an infection. Because his preferred embodiment materially affects the disease prevention properties of the claimed invention, this case is in line with those cases where the Federal Circuit has found a best mode violation. Thus, the parent application for the '259 patent fails the best mode requirement and is not entitled to the 1979 priority date. Accordingly, the patent is invalid due to the 1982 anticipatory article written by Dr. O'Neil.

### 3. Enablement Requirement

Enablement is a "legal determination of whether a patent enables one skilled in the art to make and use the

claimed invention." *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1384 (Fed.Cir.1986). In the context of this case, to be enabled, the patent specification must permit one skilled in the art to make and use the full scope of Dr. O'Neil's introducer tipped catheter without undue experimentation. *National Recovery Technologies, Inc. v. Magnetic Separation Systems, Inc.,* 166 F.3d 1190, 1195 (Fed. Cir.1999). "The enablement requirement ensures that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims." *Id.* at 1195–96. Viewing the evidence in the light most favorable to Plaintiffs, there is a genuine issue of material fact as to whether the device claimed in 1985 is enabled by the 1979 application.

 The fact that one knowledgeable in the art of the invention may have to conduct some experiments to create and use a patented device does not alone cause a patent to fail the enablement requirement. The enablement requirement is not met only if the necessary experimentation is undue. *In re Wands,* 858 F.2d 731, 736 (Fed.Cir.1988). The evidence in this case construed in favor of the Plaintiffs indicates that one skilled in the art might have to conduct a series of tests over a period of weeks to determine the appropriate length for the introducer tip of Dr. O'Neil's catheter. Defendants have not, however, shown as a matter of law that this experimentation is undue. While it is true Dr. O'Neil believed there were problems with methods used to take bacteria measurements in 1979, the evidence shows he was able to determine the appropriate distance since he achieved his preferred embodiment of 1.5 centimeters. The Federal Circuit allows a considerable amount of experimentation so long as there is a reasonable

amount of guidance. *In re Wands,* .858 F.2d at 736. The burden is on Defendants to show that there is no genuine issue of material fact that the experimentation required to construct and use Dr. O'Neil's invention was undue. Simply noting that experimentation was required and that there were problems with sampling methods is not sufficient to meet that burden, especially when the inventor conducted what he called "simple tests" over a matter of weeks and achieved his preferred embodiment. (Dep. O'Neil (9/21/94) at 229.) Having failed to meet their burden, Defendants are not entitled to summary judgment on the enablement issue of 35 U.S.C. § 112. Nevertheless, because the written description and best mode prongs were not met, the '259 patent is not entitled to the 1979 priority date, and is invalid due to the 1982 anticipatory article written by Dr. O'Neil.

### B. *Infringement*

 Plaintiffs presented evidence showing that Defendants' catheter insertion device violated the '259 patent by literally reading on each of the patent limitations.[1] In the course of discovery, Defendants' witnesses, attorneys and the documentary evidence indicated Defendants' insertion tip measured about or approximately 1.5 centimeters, identical to claim 1 of the '259 patent. (*See* Dep. Alpine Medical, Inc. at 179–181; Dep. Richard N. Starke at 297–298; Dep. Ross Sasser at 67, 68–69; Pl.'s Ex. 9, 12, 13; Transcript of Hearing on Patent Claims Construction at 59.) In response to the Plaintiffs' Motion for Partial Summary Judgment on Patent Infringement, Defendants have presented evidence that the length of their insertion tip does not fall within the 1.5 centimeter

---

1. The Federal Circuit requires the trial court to decide the issues and enter judgment on both validity and infringement claims when they are raised in the same proceeding. *Simmons Fastener Corp. v. Illinois Tool Works, Inc.,* 739 F.2d 1573, 1576 (1984).

limitation. The witnesses and documentary evidence they rely upon were not disclosed during discovery. Rule 37(c)(1) of the Federal Rules of Civil Procedure provides:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), ... is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

For this Court to consider Defendants' new evidence of non-infringement, Defendants must show either substantial justification for failing to disclose this evidence during discovery or that the failure is harmless.

Rule 26(a) of the Federal Rules of Civil Procedure required Defendants to identify all individuals with "discoverable information that the disclosing party may use to support its claims or defenses." Fed. R.Civ.P. 26(a)(1)(A). Michael Buhler, Alex Stearns and William Slevin were never identified as potentially having such information, yet Defendants wish to rely on them now for proof that their catheter assembly does not infringe the '259 patent. Rule 26(a) also required Defendants to disclose all documentary evidence which they might use to support their claims and defenses. The Defendants failed to identify the documents they now rely upon to show their catheter assembly does not infringe Plaintiffs' patent. Finally, Plaintiffs served two document requests on Defendants seeking information about the length of Defendants' insertion tips, and as with the Rule 26 mandatory disclosures, Defendants failed to produce evidence suggesting their catheter insertion device was anything but 1.5 centimeters.

The Defendants offer no substantial justification for their failure to comply with their discovery obligations. Instead, Defendants simply acknowledge that in hindsight, this evidence should have been discovered and produced. (Defendants' Response Brief, at 7 n.6.) The Defendants' apparent failure to take the obvious step of measuring the length of their catheter's insertion tip is not substantial justification for failing to comply with the requirements of the discovery process. Rule 37 is designed to be a strong incentive for parties to disclose information they will use as evidence at trial, at a hearing, or on a motion. *Snow v. Bellamy Mfg. & Repair*, 1995 WL 902210, at *4 (N.D.Ga. 1995). There is no substantial justification for Defendants' failure to discover and disclose the new evidence on infringement.

 Defendants also failed to show this Court that their discovery failures were harmless. A discovery mistake is harmless if it is honest, and is coupled with the other party having sufficient knowledge that the material has not been produced. *Burney v. Rheem Mfg. Co., Inc.*, 196 F.R.D. 659, 691 (M.D.Ala.2000). In the instant case, Defendants not only failed to disclose evidence of non-infringement, they also indicated that there was no dispute as to their catheter insertion device reading on the 1.5 centimeter limitation of the '259 patent. When Plaintiffs filed their motion for partial summary judgment, there was no reason to believe the length of the insertion device's introducer tip would be a disputed issue. Plaintiffs relied on Defendants' disclosures in framing their discovery requests, taking depositions and in filing the motion for partial summary judgment. Defendants' inaccurate discovery responses misled the Plaintiffs and the Court as to what issues would be disputed, what discovery requests were necessary, what questions to ask during depositions and the merits of a summary judgment motion on patent infringement. *See Stallworth v. E–Z Serve*

*Convenience Stores,* 199 F.R.D. 366, 369 (M.D.Ala.2001) (harm to party in having to respond to new material at late stage in action); *Trost v. Trek Bicycle Corp.,* 162 F.3d 1004, 1008–09 (8th Cir.1998) (finding prejudice in "at least partial" reliance on non-existence of evidence in preparing motion for summary judgment). As Defendants have failed to show how their discovery violations were either substantially justified or harmless, the evidence they now wish to present showing a lack of infringement will not be considered by this Court.

Having determined that the Court should not consider Defendants' untimely evidence, Plaintiffs are entitled to partial summary judgment on infringement. The record is replete with admissions that Defendants' adult size catheter assembly does in fact literally read on every limitation in the '259 patent. As this evidence stands unrebutted, Plaintiffs are entitled to summary judgment on the issue of patent infringement.

### C. *Inequitable Conduct*

■ Defendants contend that the '259 patent is unenforceable due to inequitable conduct. For inequitable conduct to make the patent unenforceable, Defendants must prove, that Plaintiffs are responsible for material misrepresentations to the patent examiner which were made with the intent to deceive. *Fiskars, Inc. v. Hunt Mfg. Co.,* 221 F.3d 1318, 1326 (Fed.Cir.2000). Inequitable conduct must be proven by "clear, unequivocal and convincing evidence and the party asserting it carries a heavy burden of persuasion." *Kanga-ROOS U.S.A., Inc. v. Caldor, Inc.,* 778 F.2d 1571, 1576 (Fed.Cir.1985). In this case, Defendants claim Plaintiffs made material misrepresentations concerning: (1) Dr. O'Neil's claim to have "discovered" a high pressure zone in the urethra; (2) prior art in the form of the Gunther reference; (3) Dr. O'Neil's representation that

he was entitled to a 1979 priority date; and (4) the date Plaintiffs had knowledge of the continuity gap between the 1979 and 1981 applications. Viewing the evidence in the light most favorable to Defendants, there are no genuine issues of material fact, and Plaintiffs are entitled to summary judgment on the Defendants' claim of invalidity due to inequitable conduct.

### 1. *Material Misrepresentations*

■ First, Defendants assert that Dr. O'Neil made a material misrepresentation by telling the Patent and Trademark Office that he "discovered that the pressure exerted through the wall of the urethra increases from each of its ends toward the middle so as to reach a maximum pressure about midway." (Pl.'s Ex. 9 at 6.) Defendants claim that this is a misrepresentation because Dr. O'Neil was not the first person to understand that a mid-urethral high pressure zone exists. In response, Plaintiffs contend that Dr. O'Neil never meant to infer he was the first to find that phenomena, but instead, only meant to inform the patent examiner that he had learned of the existence of the high pressure zone.

No reasonable jury could conclude that Dr. O'Neil's use of the word "discovered" was a misrepresentation. Defendants ask this Court to adopt an overly narrow definition of the word "discovered" and ignore the context in which the word was used. This Court declines that invitation. Although it is true that the word "discovered" can convey the message that someone was the first person to realize an achievement, "discovered" is also used in common parlance to indicate that someone obtained knowledge of a fact by search or study. *See American Heritage Dictionary of the English Language* 376 (1979) ("discover ... 1. To obtain knowledge of; arrive at through search or study ... 2. To be the

first to find, learn of, or observe"); *see also Shellmar Products Co. v. Allen–Qualley Co.*, 87 F.2d 104, 108 (7th Cir.1936) (discover means "to get first sight or knowledge of; to get knowledge of what has existed but has not theretofore been known to the discoverer").

Defendants presented no evidence from which a jury could conclude ·that Dr. O'Neil intended "discovered" to have the narrow meaning of first to find. In fact, Dr. O'Neil himself removed any doubt about the intended meaning of "discovered" when he disclosed the 1973 article by Mayo and Hinman on the high pressure zone in the female urethra. The disclosure of that article did not cure a misrepresentation. It shows there never was a misrepresentation. Disclosing the Mayo and Hinman article which long predated his patent application shows that Dr. O'Neil was not claiming to be the first scientist to find the mid-urethral high pressure zone, but rather that he learned of its existence. Accordingly, Defendants cannot show that Dr. O'Neil's use of the word "discovered" amounted to a misrepresentation.

Additionally, with respect to the "discovery" statement, this Court finds that even if there was a misrepresentation, it was wholly immaterial to the prosecution of the patent. The '259 patent does not claim the high pressure zone as an invention. The identity of the first discoverer is totally irrelevant to the patentability of ·Dr.· O'Neil's invention. The cases cited by Defendants in support of the argument that inventor or applicant misstatements are necessarily material are not persuasive. Those cases all deal with matters which a patent examiner would find material no matter who said them, because they were important to the prosecution of the patent. *See General Electro Music Corp. v. Samick Music Corp.*, 19 F.3d 1405, 1411 (Fed. Cir.1994) (finding material misrepresentation where applicant lied in an affidavit that he conducted a prior art search); *Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.*, 984 F.2d 1182, 1190 (Fed.Cir.1993) (affirming summary judgment where applicant filed false information regarding sales solely in control of applicant); *Rohm & Haas Co. v. Crystal Chemical Co.*, 722 F.2d 1556, 1571 (Fed. Cir.1983) (false affidavits concerning prior art); *Procter & Gamble Co. v. Kimberly–Clark Corp.*, 740 F.Supp. 1177, 1197 (D.S.C.1989) (misrepresentations in affidavits submitted to overcome rejections and prior art rejections). The instant case is distinguishable· because whoever first realized the existence of a high pressure zone is wholly irrelevant to the issuance of the '259 patent. The only thing that matters is that the high pressure zone existed, and there is no misrepresentation on that point. Thus, though this Court concludes that there was no misrepresentation by Dr. O'Neil in claiming to have "discovered" the high pressure zone, any potential misrepresentation was not material, and accordingly cannot support a claim of inequitable conduct.

██ The second misrepresentation alleged by Defendants is based on Dr. O'Neil's disclosure of the Gunther prior art reference to the patent examiner. The undisputed facts show that the Gunther reference was disclosed to the patent examiner, and that attention was drawn to that reference by Dr. O'Neil. (Pl.'s Ex. 3, p. 7–8.) The Federal Circuit has held that when a reference is disclosed to the patent examiner, there can be no inequitable conduct claim with respect to that reference. *Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1327· (Fed.Cir.2000); *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1582 (Fed.Cir.1991). Accordingly, there is no misrepresentation with respect to the Gunther reference.

■ Next, Defendants allege that Dr. O'Neil committed inequitable conduct by asserting he was entitled to the 1979 priority date. Although this Court has decided that Dr. O'Neil was in fact not entitled to the 1979 priority date, that does not mean his claim for it was a misrepresentation to the patent examiner. Defendants' view of the law would have this Court hold that whenever a patent is declared invalid, that at least some of the representations made to the patent examiner were misrepresentations. This is not the law. Defendants have done no more than show that Dr. O'Neil was mistaken in representing to the patent examiner that he was entitled to the 1979 priority date. Mere negligence, or an error in judgment, is insufficient as a matter of law for inequitable conduct. *N.V. Akzo v. E.I. Dupont de Nemours,* 810 F.2d 1148, 1153 (Fed.Cir.1987). This is especially the case when the examiner has before him everything necessary to render a decision on the issue of priority, as the examiner did in this case. *See Origin Medsystems, Inc. v. General Surgical Innovations, Inc.,* 1999 WL 507160, at *1 (Fed.Cir.1999) (where all information necessary to rule on prior art was before the Court the applicant's attempts to distinguish the art were not a material misrepresentation). Thus, there is no material misrepresentation based on Dr. O'Neil's claim for a 1979 priority date.

■ Finally, Defendants contend Dr. O'Neil mislead the office when he became aware of the lack of continuity between the 1979 and 1981 applications. Defendants claim Dr. O'Neil and his attorneys knew in August of 1992 of two continuity gaps. Plaintiffs contend they did not learn of the 1979–81 gap until March of 1993. This particular matter was the subject of a motion for summary judgment in the litigation between Plaintiffs and C.R. Bard, Inc. In that case, this Court awarded summary judgment to Defendants that the patent was unenforceable due to inequitable conduct. On appeal, the Federal Circuit reversed and remanded on the grounds that there was insufficient evidence to support a finding of inequitable conduct as a matter of law. *Go Medical Industries Pty, Ltd. v. C.R. Bard, Inc.,* 250 F.3d 763, 2000 WL 1056063, at *6 (Fed.Cir.2000). In its decision, the Circuit Court laid out for the Defendants what additional evidence should be developed to support the inequitable conduct claim.

In opposing summary judgment, the Defendants rely on the same evidence which the Federal Circuit found insufficient in the previous litigation. The additional evidence in this case supports Plaintiffs' position that there was no inequitable conduct. This evidence indicates that Dr. O'Neil, his representatives and attorneys were not aware of the 1979–81 continuity gap in August of 1992. (*See* Dep. John C. Linderman (4–30–2002) at 14, 17, 18, 24, 34, 37, 40, 52, 59.) Because Defendants failed to take those steps which the Federal Circuit said were necessary to develop an inequitable conduct claim, there is no evidence to rebut Mr. Powell's claim of good faith with respect to the filing of the June 1993 petition. All of the additional evidence produced indicates Plaintiffs did not know about the 1979–81 continuity gap until March of 1993. Following the decision of the Federal Circuit in the Bard litigation, summary judgment for Plaintiffs is proper.

### 2. *Intent to Mislead*

■ In addition to a material misrepresentation, inequitable conduct also requires an intent to mislead the patent examiner. Direct evidence of intent is hard to come by and is, therefore, not required. Instead, in most cases, the evidence of an intent to mislead is circumstantial. *Critikon, Inc. v. Becton Dickinson Vascular Access. Inc.,* 120 F.3d 1253, 1256 (Fed.Cir.

1997). Whether there is sufficient evidence of intent is related to the materiality of the misrepresentation, for as the Federal Circuit has said, the more material the misrepresentation, the lighter the evidentiary burden on the party seeking to show intent. *Id.* Nevertheless, materiality is not enough alone; there must be something else besides just materiality to find there was an intent to mislead the patent office. *See Allen Organ Co. v. Kimball Intern., Inc.,* 839 F.2d 1556, 1567 (Fed.Cir.1988) (noting that materiality and intent are two separate requirements). Viewing the evidence in the light most favorable to Defendants, there is no genuine issue of material fact regarding Plaintiffs' intent to mislead the patent examiner. Summary judgment for Plaintiffs is proper.

Defendants claim that intent to mislead is shown by the materiality of the misrepresentations and the fact that those misrepresentations came from Dr. O'Neil and his attorneys. This is not sufficient to make out a showing of intent. Initially, not all of the alleged misrepresentations were material. However, as noted above, materiality alone is not enough to satisfy the intent element. *Allen Organ Co.,* 839 F.2d at 1567; *see also Tol–O–Matic, Inc. v. Proma Produkt–Und Marketing Gesellschaft m.b.H.,* 945 F.2d 1546, 1553–54 (Fed.Cir.1991) (no inequitable conduct without finding of intent even though misrepresentations were material). Defendants were required to present some probative evidence of intent, but they failed to do so in this case.

■ Defendants claim that the fact that the putative misrepresentations came from the inventor and his attorneys is probative of intent. However, that argument is inconsistent with Federal Circuit precedent where there was no intent to mislead despite the patent owner's material misrepresentations to the patent office. *See Tol–O–Matic, Inc.,* 945 F.2d at 1553–54; *Manville Sales Corp. v. Paramount Systems, Inc.,* 917 F.2d 544, 552 (Fed.Cir. 1990) (failure to find duty to disclose experimental use was harmless error where there was no intent to mislead). Indeed, Defendants' view of the law would virtually eliminate the distinction between materiality and intent, since in most cases the supposed material misrepresentations are made by the inventor or his attorneys. Given the Federal Circuit's general distaste for claims of inequitable conduct, this reading of the law is not warranted. *See Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1482 (Fed.Cir.1998) (noting habit of charging inequitable conduct in every patent case only serves to distract the court from genuine issues and spawns satellite litigation); *Burlington Indus., Inc. v. Dayco Corp.,* 849 F.2d 1418, 1422 (Fed.Cir.1988) (noting habit of charging inequitable conduct in every patent case is an "absolute plague"). Certainly, there are cases where the factual basis for inequitable conduct should go to a jury; however, this is not one of those cases. As Defendants failed to present evidence upon which a reasonable jury could conclude Dr. O'Neil intended to mislead the patent office, Plaintiffs are entitled to summary judgment on the claim of invalidity due to inequitable conduct.

### D. *Trademark Claims*

The Defendants continued to market the "MMG/O'Neil" catheter after the termination of the 1988 agreement. Plaintiffs assert that the continued use of the "O'Neil" name on Defendants' product constitutes trademark infringement and unfair competition under state law (collectively referred to as "trademark claims").[2]

---

**2.** The elements of the state and federal law claims are similar if not identical. *University*

*of Georgia Athletic Ass'n v. Laite,* 756 F.2d 1535, 1539 n. 11 (11th Cir.1985).

Plaintiffs claim there was a trademark license between Go Medical and Medical Marketing, and that Defendants are, therefore, estopped to challenge the validity of the mark or bring trademark actions against Plaintiffs. Defendants respond by asserting that Plaintiffs cannot establish that the name "O'Neil" was a mark which could be infringed, that there was no trademark license between the parties, and that if there was, the mark was abandoned due to naked licensing. Defendants also filed a cross-motion for summary judgment on their own trademark infringement claims and related state law claims, claiming that Plaintiffs' marketing of their urinary catheter product infringes Defendants' "MMG/O'Neil" trademark. Viewing the evidence in the light most favorable to Defendants, there are genuine issues of material fact with respect to Plaintiffs' trademark claims.

### 1. *Ownership of the O'Neil Mark*

The first step in a trademark infringement claim is establishing ownership of the mark. *TMT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876, 882 (7th Cir.1997). The Defendants contend that the Plaintiffs have not shown ownership of a protectable trademark in the O'Neil name associated with a urinary catheter. Eleventh Circuit caselaw on this issue is clear. Because "O'Neil" is a surname, trademark law protects the Plaintiffs' right of exclusive use of the name only to the extent that the name has acquired "secondary meaning." *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1513 (11th Cir.1984). Furthermore, the court has held:

> The factors to consider in determining whether a name such as [O'Neil] has acquired secondary meaning are: (1) the length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connec-

tion in the public's mind between the name and the plaintiff's product or business; and (4) the extent to which the public actually identifies the name with the plaintiff's product or venture.

*Id.* There are factual disputes as to all of these factors. Therefore, the Plaintiffs' motion for partial summary judgment should be denied.

### 2. *License Agreement*

Plaintiffs contend that the original agreement between the parties contained a trademark license. Plaintiffs marketed their product using the "O'Neil" mark before forming a relationship with Defendants. (Pl.'s Ex. 48–50.) A representative of Medical Marketing then approached Defendants and inquired about becoming a distributor of the O'Neil System. The fruit of this initial contact was a ninety-nine year "marketing and manufacturing agreement." (Pl.'s Ex. 4 at ¶ 1A.) The agreement gave Medical Marketing "exclusive marketing and selling rights" for the "O'Neil Intermittent Catherization Systems." (Pl.'s Ex. 4 at ¶ 1, 2.) Plaintiffs contend that this original agreement acted as a trademark license, estopping Defendants from challenging the validity of Plaintiffs' mark. There is no express grant of a trademark license in the agreement. If one exists, it must be implied from the circumstances surrounding the agreement. *Professional Golfers Ass'n of America v. Bankers Life & Cas. Co.*, 514 F.2d 665, 669 (5th Cir.1975); *Novell, Inc. v. Network Trade Center Inc.*, 25 F.Supp.2d 1218, 1224 (D.Utah 1997); *Birthright v. Birthright Inc.*, 827 F.Supp. 1114, 1134–35 (D.N.J.1993).

Initially, the length of the original contract, ninety-nine years, contemplates more than a mere patent license. The '259 patent had a life of only 17 years, and so a ninety-nine year agreement must have granted something more than patent

rights to Defendants. Additionally, the language in original agreement indicates that Medical Marketing was given all the rights necessary to manufacture, sell and promote Dr. O'Neil's invention. The contract granted to Medical Marketing "exclusive marketing and selling rights" to the "O'Neil Intermittent Catherization Systems." Implicit in such a grant of authority over a named product is the right to use that mark, which Defendants accepted with the agreement.

The conduct of the parties after the initial agreement is also consistent with an implied trademark license. For the first year and a half of their relationship, Defendants did not manufacture the O'Neil catheter system, but instead took shipment from Plaintiffs as a distributor of the product. During that time, Defendants repeatedly referred to Dr. O'Neil's invention by using only the "O'Neil" mark in office and sales communications. (Pl.'s Ex. 5, 11–12, 14–16, 18–20, 43–44.) Defendants continued to distribute the product using the O'Neil mark previously established by Plaintiffs until an agreement was reached to alter the identification on the product packaging. (Pl.'s Ex. 29 (noting lack of Medical Marketing on product packaging and agreement to alter)). Thus, consistent with a trademark license, Defendants marketed and referred to Dr. O'Neil's invention using the same "O'Neil" mark which Plaintiffs utilized before the agreement was executed.

The record also indicates that Plaintiffs exercised a measure of control over the use of the "O'Neil" mark, and that Defendants recognized the presence of that control. When Defendants wanted to alter the way the product was marketed, they sought permission from Plaintiffs before using the "O'Neil" mark in conjunction with their own. (Pl.'s Ex. 29, 68 ¶ 9–14.) After obtaining Plaintiffs' approval, Defendants began using the "MMG/O'Neil"

mark on catheter system packages. (*Id.*) Seeking permission before using the Medical Marketing mark with the O'Neil mark confirms that Plaintiffs exercised some control over the use of their mark. The extent of that control is a matter hotly disputed as discussed below.

Defendants contend that there was no trademark license based primarily on the fact that the original agreement contained no express grant of a trademark license. The lack of express language is some evidence that there was no agreement. The circumstances of this case, including the actions of the parties before the agreement, the language of the agreement, the length of the agreement and the conduct of the parties after the agreement was reached are factual matters to be weighed by the jury in determining whether there was a licensing agreement. The Court cannot say that Plaintiffs are entitled to judgment as a matter of law on the issue of whether there was a licensing agreement. If the jury determines that they are former licensees, the Defendants will be estopped from challenging the validity of Plaintiffs' mark, and will be estopped from bringing their trademark counterclaims against the Plaintiffs. *Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1412 (11th Cir. 1998); *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 548 (10th Cir.2000). Whether there is such an estoppel must be determined at trial. Therefore, Plaintiffs are not entitled to summary judgment on their trademark claims. For the same reasons, Defendants are not entitled to prevail on their cross motion for summary judgment on trademark claims.

### 3. *Control*

 Defendants contend that even if Plaintiffs did have a protectable mark covered by an implied license, the mark

was abandoned due to naked licensing. A license is naked, resulting in trademark abandonment, when there is insufficient control retained by the trademark owner to ensure the quality of production and prevent public confusion. *Barcamerica Intern. USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 596 (9th Cir.2002). The rationale behind the control requirement is that if a trademark owner does not maintain sufficient control over the use of its mark, the public may be misled by the mark's presence to purchase substandard goods or services. *U.S. Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 140 (3rd Cir.1981). The party challenging the sufficiency of control by a mark owner has a stringent burden, because only minimal control is required to make the trademark license valid. *Id.* at 140; *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir.1977). Moreover, the control provisions need not be explicit on the face of the agreement. *Barcamerica*, 289 F.3d at 596. Instead, they may be implied by the circumstances of the particular case, the actions of the parties, and the actual use of control by the trademark owner. *Id.*

The degree of the Plaintiffs' exercise of quality control is hotly disputed. The Plaintiffs point to evidence of their efforts to ensure that the Defendants were complying with quality standards necessary in the industry and necessary to satisfy Dr. O'Neil. (*See* Pl.'s Ex. 28 (letter noting Go Medical Officer complaining about FDA compliance at Medical Marketing plant); 42 (noting purpose of agreement is to ensure uniform product throughout world and requiring product to be consistent with Dr. O'Neil's specification); 52 (letter from Medical Marketing official seeking aid in assuring Go Medical official that Medical Marketing employee was not hired only to reach "bare minimum" FDA compliance); 54 (letter from Medical Marketing informing Go Medical official they

are aware of "flashing problems" and are working to resolve them); 57 (letters concerning quality issues with Medical Marketing catheters); 69 ¶¶ 5–13.) In addition to the documentary evidence of control, the fact that Medical Marketing sought permission from Plaintiffs before altering the original O'Neil mark indicates Plaintiffs had some level of control with respect to the use of their trademark. The evidence in this case shows that Plaintiffs had some control over the product sold under the O'Neil name. Whether it was sufficient control over the use of their trademark to avoid consumer confusion is a genuine issue of disputed fact. *Visa, U.S.A., Inc. v. Birmingham Trust Nat'l. Bank*, 696 F.2d 1371,1375 (Fed.Cir.1982). Therefore, the motion for partial summary judgment should be denied.

### 4. *Likelihood of Confusion*

■ The Defendants in their trademark counterclaims asserted that there was a likelihood of confusion due to Plaintiffs' and Defendants' use of the same O'Neil marks for urinary catheters. This constitutes a judicial admission which precludes them from contesting this issue. *Schott Motorcycle Supply, Inc. v. American Honda Motor Co., Inc.*, 976 F.2d 58, 61–62 (1st Cir.1992). Although Defendants attempt to deny there is a likelihood of confusion in their response to the Plaintiffs' motion for partial summary judgment, they have presented no evidence to justify releasing them from their admissions implicit in their counterclaims and cross-motion for summary judgment. (*See* Answer to Plaintiffs' First Amended Complaint with Counterclaim, [Doc. 5] pp. 21–29; Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment on Trademark Claims and in Support of Defendants' Cross Motion for Partial Summary Judgment, [Doc. 87].) Nevertheless, even assuming there was no

admission, Defendants' own witnesses conclude there is a likelihood of confusion between Plaintiffs' and Defendants' marks. (Dep. David Emm at 26–28; Dep. Ross Sasser at 33.) Accordingly, viewing the evidence in the light most favorable to Defendants, there is a likelihood of confusion between the marks in this case.

### E. *Lost Profits*

Plaintiffs have claimed that in addition to their statutory remedy, they are entitled to approximately thirty million dollars in lost profits due to Defendants' patent infringement. Defendants challenge Plaintiffs' claim to lost profits, asserting Plaintiffs cannot satisfy the four prong inquiry of *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir.1978). In *Panduit,* the Court found that to establish a claim for lost profits, a litigant must show: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) plaintiff's manufacturing and marketing capability to exploit the demand; and (4) the amount of profit plaintiff would have made. *Id.* at 1156. Plaintiffs must be able to satisfy every prong of the test to recover lost profits. Though the first prong of this test is not in dispute, the other three are vigorously contested by the parties. Because Plaintiffs cannot satisfy the second, third and fourth prongs of *Panduit,* summary judgment for Defendants on the issue of lost profits is proper.

### 1. *Absence of Non–Infringing Substitutes*

Because Plaintiffs cannot show the absence of non-infringing substitutes, summary judgment for Defendants is proper. C.R. Bard, Inc. produces an introducer tipped urinary catheter which, because of a settlement in prior litigation, it is free to produce even though it may literally infringe Plaintiffs' patent. Plaintiffs contend that this catheter is not a substitute for their product. However, the evidence in this case demonstrates otherwise. Some patients who used the O'Neil catheter made the decision to switch to other catheters, including Bard's, without any evidence of difficulty or increased infections as a result. (Wells Dep. at 348; Sasser Aff., ¶ 15, 21–22.) Moreover, the studies cited by Plaintiffs to show that only the 1.5 centimeter insertion tip prevents infection do not prove that proposition. Those studies considered only catheters with 1.5 centimeter introducer tips, and thus say nothing about the infection prevention qualities of other catheters with insertion tips of different lengths. (Pl.'s Ex. 7–9, 11–12.) Finally, the expert who opined that competing introducer tipped catheters infringed the '259 patent is not knowledgeable in the field of patent law, and thus his testimony is not persuasive. (Dep. Sam D. Graham, M.D. at 73–74.) Defendants have shown there is no genuine issue of material fact regarding the presence of non-infringing substitutes, and Plaintiffs have failed to meet their burden. Accordingly, Defendants are entitled to summary judgment on the issue of lost profits.

### 2. *Capacity to Manufacture and Market Product*

Plaintiffs' inability to satisfy the "substitutes" prong of *Panduit* obviates the need to consider the other disputed factors. Nevertheless, for the sake of completeness, this Court will address the other issues as well. To satisfy the "capacity" prong, Plaintiffs must present proof of their ability to manufacture and market the catheter profitably. This proof must be sound as to Plaintiffs' ability in those areas; speculative opinions or guesswork will not suffice. *See Oiness v. Walgreen Co.*, 88 F.3d 1025, 1031 (Fed.Cir.1996) ( projections of lost profits cannot be based on speculative proof or guesswork). Defendants have challenged the sufficiency of

Plaintiffs' proof on this prong, alleging that it falls short what the law requires. The Court agrees.

Plaintiffs' evidence of their ability to manufacture and market catheters for the United States market comes from Dr. O'Neil himself, in the form of, what he called, "guesses," and the expert report of David A. Kennedy. (Dep. Alexander G.B. O'Neil at 65–70; Def.'s Ex. 1.) As for Dr. O'Neil's deposition testimony on manufacturing production, he repeatedly called his answers "guesses" or "his best guess" and twice identified other people who could provide more accurate information than he. (Dep. O'Neil at 65–70.) The inventor's "guesses" about manufacturing capacity hardly satisfy the showing required for this prong of the *Panduit* analysis, for they fall into the categories of speculation and guesswork which the Federal Circuit has found insufficient in a lost profits analysis. Accordingly, Dr. O'Neil's testimony is not sufficient to carry a case of lost profits to the jury.

 Additionally, the report of Plaintiffs' expert, David A. Kennedy, is insufficient to carry the lost profits issue to the jury. Rule 702 of the Federal Rules of Evidence authorizes the Court to hear evidence in the form of opinion testimony from an expert witness. However, the opinion of the expert must be both reliable and relevant, or the Court should disregard it. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In satisfying the reliability prong of the test for an expert opinion, the Court must find that the opinion is based on knowledge, and not mere speculation or conjecture. *Id.* at 589–90, 113 S.Ct. 2786; *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir.1999). Plaintiffs are correct that in a lost profits analysis an expert is required to opine as to what would happen in a hypothetical market—a market without

the Defendants' infringement. Nevertheless, the necessity to base an opinion on a hypothetical market does not make an opinion based on speculation or guesswork admissible. ·

In the instant case, Mr. Kennedy's opinion is not based on his or anyone else's knowledge, and this Court will not consider it in the lost profits analysis. Mr. Kennedy's opinion as to manufacturing and marketing is based in large part on Dr. O'Neil's guesses instead of actual knowledge of the capability of Plaintiffs' facilities or the costs to upgrade them. (Pl.'s Ex. 19, Expert Report of David A. Kennedy, p. 13.) Other parts of the opinion speculate and assume premises without any indication of support, leaving the Court without any guidance as to the validity of the expert's assessment. (*Id.* at 14–15.) Finally, at least one of Kennedy's key assumptions—that there were no non-infringing substitutes—is simply wrong. (*Id.* at 13.) Having to make assumptions about a hypothetical market is one thing, but making those assumptions based on the guesses of others, speculation and erroneous beliefs is quite another. This is insufficient to satisfy the capacity prong of the *Panduit* test. Summary judgment for Defendants is proper.

### 3. *Proof Regarding Plaintiffs' Lost Profits.*

Plaintiffs have failed to show that they made any profits on the catheters sold in the United States since termination of the agreement with MMG. The only proof as to the amount of lost profits suffered because of Defendants' infringement comes from the expert testimony of David A. Kennedy. This Court has already concluded that Kennedy's report is unreliable, and under *Daubert* cannot serve as evidence of the amount of lost profits. Without the Kennedy opinion, Plaintiffs present

no evidence sufficient to create a jury issue on lost profits. Summary judgment for Defendants is proper on the lost profits claim.

### F. State Law Counterclaims

Defendant Medical Marketing asserts several state law counterclaims against Plaintiffs, including fraud, negligent misrepresentation, breach of implied warranty, breach of contract and tortious interference with contractual rights. The Defendant concedes that Plaintiffs are entitled to summary judgment on the claims of fraud, negligent misrepresentation and tortious interference. The contested claims of breach of contract and implied warranty are discussed below.

■■■ Medical Marketing contends that in 1997, Plaintiff Go Medical agreed to provide to the Defendant exclusive control of the introducer tipped catheter market, ousting all others from competition. It urges the Court to rewrite the 1997 contract in wholesale fashion. The Defendant's interpretation of the 1997 contract borders on the absurd, especially considering the contract with all of its attendant circumstances. The language upon which the Defendant base its claim provided that MMG would owe royalty payments to Plaintiffs so long as there was a "patented basis for exclusivity." (Def.'s Ex. 3, ¶ A4.) However, an examination of the facts shows that the quoted language only intended to limit the license to the life of the patent. Because there is no warranty guaranteeing Defendant would be the exclusive dealer of introducer tipped catheters, summary judgment for Plaintiffs is proper.

■■■ Medical Marketing relies upon various letters written by its president and other communications between the parties in its attempt to rewrite the contract between the Defendant and Go Medical. The cardinal rule of contract interpretation is to ascertain the intent of the parties. O.C.G.A. § 13–2–3. While the expressed intent of the parties is generally admissible, the expressed intent of only one party is not relevant unless it is shown the other party to the agreement had the same intent. *Harkins v. CA 14th Investors, Ltd.,* 247 Ga.App. 549, 550, 544 S.E.2d 744 (2001). This is especially the rule when one of the parties raises new intentions for the first time during litigation. (*Compare* Affidavit of John H. Golden—12/23/2002, ¶ 8 (expressing belief of entitlement to market exclusivity) *with* Pl.'s Ex. 116 (notes of John Golden mentioning patent validity as reason no royalties were owed, but failing to mention anything regarding market exclusivity)).

In this case, Medical Marketing's president, John Golden, indicated that he believed the 1997 amendment to the contract between Go Medical and Medical Marketing guaranteed Medical Marketing exclusivity in the introducer tipped catheter market. (Golden Aff.—12/23/2002, ¶ 8.) In essence, he believed that Medical Marketing would owe no money in royalties to Go Medical if other manufacturers entered the marketplace and made introducer tipped catheters. However, Defendant cannot point to a single instance where Go Medical agreed to such a proposition. Thus, Golden's assertions of contractual intent provide no probative evidence of the mutual intent of the parties in making the agreement.

Even if this Court were to consider Golden's intention, this Court would still conclude there is no guarantee of market exclusivity for Defendant. To see the absurdity of Golden's assertions, one must consider the implications of such an agreement. Even if the '259 patent was valid and enforceable against infringers, under Defendant's theory, Medical Marketing would owe nothing to Plaintiffs if some

other manufacturer created an introducer tipped catheter. It would furthermore be irrelevant whether the new catheter violated the '259 patent, for under Defendant's interpretation, the mere appearance of a new introducer tipped catheter would violate the agreement by denying it market exclusivity. Such a strained reading of the contract is not warranted. The more logical reading of the contract is that it was to last until the patent term expired.

The Defendant's interpretation makes even less sense when read in conjunction with the rest of the agreement. In response to a request from Defendant, Go Medical expressly refused to include a warranty as to the validity of the patent. (Pl.'s Ex. 113, ¶ 4.) Plaintiffs believed that this was never a part of the deal between the parties, and that it would alter their relationship which Plaintiffs expressly did not want. (*Id.*) Medical Marketing acquiesced, and indicated no additional warranty of patent validity would be required. (Pl.'s Ex. 114.) Consistent with these negotiations, there was no warranty of patent validity in the 1997 amendment to the parties' contract. (Def.'s Ex. 3.) Considered in context, it is obvious that Plaintiffs never intended to guarantee Defendant a monopoly on introducer tipped catheters. Plaintiffs' undisputed refusal to warrant the validity of the patent is not reconcilable with a putative warranty of market exclusivity. To read the contract otherwise makes absolutely no sense. Because no reasonable jury could interpret the facts otherwise, summary judgment for Plaintiffs is proper.

Finally, as for the notice provision of the contract, notice was required before the initiation of collection activities, not before contract termination. (Pl.'s Ex. 3, ¶ A4. c.) Nevertheless, even if notice was required, Defendant was given notice of its default by Plaintiffs' request for delinquent payments. (Pl.'s Ex. 116.) Summary judgment for Plaintiffs is proper on all of Defendant's non-trademark state law counterclaims.

## IV. CONCLUSION

For the reasons set forth above, the Plaintiffs' Motion for Partial Summary Judgment on Trademark Claims [Doc. 86] is DENIED. The Defendants' Cross Motion for Partial Summary Judgment on Trademark Claims [Doc. 87] is DENIED. The Plaintiffs' Motion for Partial Summary Judgment on Inequitable Conduct Claims [Doc. 93] is GRANTED. Plaintiffs' Motion for Partial Summary Judgment on Issues of Anticipation and Obviousness Based on Pre–1979 Prior Art [Doc. 94] is DENIED as moot. Plaintiffs' Motion for Summary Judgment on Defendant MMG's State Law Counterclaims [Doc. 95] is GRANTED. Plaintiffs' Motion for Partial Summary Judgment on Patent Infringement [Doc. 102] is GRANTED. Defendants' Motion for Partial Summary Judgment on Lost Profits [Doc. 103] is GRANTED. Defendants' Cross Motion for Summary Judgment on Contract Claims [Doc. 104] is DENIED. The Defendants' Motion for Summary Judgment of Invalidity [Doc. 105] based upon priority date is GRANTED. The Defendants' Motion for Summary Judgment [Doc. 105] based upon pre–1979 prior art is DENIED as moot.